**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:26-cr-9** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **ANTONIO TRIPLETT,** | : | |
| | : | |
| **Defendant.** | : | |

**OPINION AND ORDER**

This matter comes before the Court on Defendant Antonio Triplett's Motion to Suppress. (ECF No. 46).  For the following reasons, Triplett's Motion is **DENIED**.

## I.    BACKRGOUND

### A.  Factual Background

Just before midnight on July 11, 2025, officers with the Columbus Division of Police met with Haley Mitchell in a parking lot.  Earlier that evening, Mitchell had called 911 for assistance. She claimed that armed men had come into her home and threatened to shoot her when she told them to leave.  Mitchell's statements to police were captured on body cameras worn by Columbus Police Sergeant Harshbarger and Officers Sommerkamp, Feldman, and Blevins.

Mitchell provided the following account to police.  She had moved into her home approximately a week earlier, in early July 2025.  (Sommerkamp Body-Worn Camera Video, Gov't Ex. A at 4:39).  Nobody else lived there when she moved in.  (*Id.* at 4:42).  But Mitchell allowed two of her friends—Jess and Topanga—to be in her home.  (*See* ECF No. 49 at 2).  Around July 10, 2025, Jess and Topanga were at the house.  While they were there, they let two men enter.  One of the men, who they (descriptively) called "Man," was Israel Lee.  The other, known as "Trip," was

1

Man's friend, Antonio Triplett.  Triplett and Man were armed with guns, and brought a Hispanic kid they called "Amigo" with them into the house.  Triplett and Man proceeded to sodomize Amigo with the ends of their firearms for stealing from Man.  (Gov't Ex. A at 5:35).  Mitchell fled in fear, but later returned and ordered Triplett to leave.  As she recounted to police, "Trip walks out of the house with a gun, I say get the fuck out of my house, I've asked you twice already, I've stayed gone all day, you guys have not left."  (*Id.* at 4:17).  Triplett retorted with a threat to "spray" her with his gun, and once he saw that she was calling 911, he told her that he would call Man.  (*Id.* at 4:17, 31:46–32:15).

While several officers met with Mitchell at the parking lot, others responded to the home. When police first arrived at the house, Triplett met them at the door.  He claimed to live there, informing police that all the occupants—including Mitchell—"share[d]" the house.  (Feldman Body-Worn Camera Video, Def.'s Ex. 1 at 5:57).  He pointed through the open door to the front room to a woman who was sleeping on what Triplett referred to as a "couch," saying that he had his "people right here" and pointing out that he and the woman's belongings were in that room.  (*Id.* at 6:15, 6:58).  Triplett told police that Mitchell had "run off with the keys" to the house.  (*Id.* at 7:06).

When police entered the front room, they woke the sleeping woman and ordered her to stand up.  She complied without complaining or inquiring why police officers—with guns drawn— would enter the house, rouse her, frisk her, and handcuff her.  (*Id.* at 9:00).  Triplett, this woman, and one other male occupant who had been inside the house were separated and detained outside by the police.  Triplett again asserted that he lived in the house and had just moved in, but when asked, he could not recall the landlord's name.  (Blevins Body-Worn Camera Video, Def.'s Ex. 2 at 7:05, 7:40).  In fact, he appeared to forget Mitchell's name when police inquired about the other residents. Meanwhile, the woman identified herself as Jessica Miller.  (Def.'s Ex. 1 at 12:22).  When police

asked her whether the house was her home, she definitively answered "no" and confirmed that she was homeless.  (*Id.* at 13:05).  When asked who "actually lives" in the house, Miller stated that the *only* resident was Haley Mitchell.  (*Id.* at 15:02).

While talking to police at the parking lot, Mitchell consented to a police search of the home. Although she initially hesitated to go back due to her fear of Trip and Man, she ultimately returned with Columbus police officers.  (Gov't Ex. A at 16:35).  There, the police informed Mitchell that Triplett was willing to leave, but wanted his "shoes and outfits" that remained in the house. (Harshbarger Body-Worn Camera Video, Gov't Ex. B at 2:20).  Mitchell and other officers, including Sergeant Harshbarger, entered the residence to collect Triplett's possessions.  They entered the front door, which led directly into the front room of her house, where an air mattress had been placed on a futon that both Mitchell and Triplett identified as a couch.  The front room contained a dresser, a television, a computer monitor, and several chairs folded up against the wall. The police marched through the front room, through an adjoining kitchen area and into the back room—which Mitchell claimed was her bedroom.  In the kitchen, the police found several pairs of Triplett's shoes.  In the front room, they found some of Triplett's clothes, as well as clothes that Mitchell said belonged to Jessica Miller.

After the police had gathered Triplett's clothing and shoes, Mitchell asked whether the police had found Triplett's gun.  When Sergeant Harshbarger confirmed that they had not, Mitchell declared: "It's in this house.  I'm gonna find it for you guys."  She directed the police to search the closet in her room for Triplett's gun.  (*Id.* at 12:45–13:12).  The police later expanded their search to other rooms in the house.  Although they expressed skepticism that Triplett would have left a firearm at the house, Sergeant Harshbarger found a handgun with a thirty-round magazine tucked under the air mattress on the futon in the front room.  (*Id.* at 16:25–16:30).  Following this discovery,

3

Mitchell confirmed to police that she was the sole resident, and that nobody lived in the front room of her house.  (*Id.* at 17:20–17:27, 17:40–18:28).  Columbus police later obtained a search warrant for Triplett's DNA and determined that it was present on the handgun.  (ECF No. 49 at 4).

### B.  Procedural Background

On January 15, 2026, a grand jury charged Triplett with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), as well as possession of a firearm as a person convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(8).  (ECF No. 5 at 1–2).  On June 3, 2026, Triplett moved to suppress the evidence obtained as a result of the warrantless police search of the front room of Mitchell's house.  (ECF No. 46).  The Government opposed, (ECF No. 49), and Triplett replied.  (ECF No. 52).

The Court held a suppression hearing on June 9, 2026.  At the hearing, the parties stipulated to the authenticity and admissibility of all officer body-worn camera footage, and Sergeant Harshbarger and Officer Sommerkamp testified.  The Court ordered Triplett's counsel first to address his standing to challenge the police search of the home before addressing the merits of suppression.

### II.    STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures by the Government.  It provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  To comply with the Fourth Amendment, law enforcement generally must obtain a warrant, supported by probable cause and from a "neutral and detached" judicial officer, before searching people, homes, or property for evidence of criminal wrongdoing. *Riley v. California*, 573 U.S. 373, 283 (2014) (citation and internal quotation marks omitted); *see*

*Kentucky v. King*, 563 U.S. 452, 459–60 (2011).  These requirements "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction."  *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989).  When law enforcement violates these requirements, "courts generally suppress the resulting evidence."  *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019).  Warrantless searches and seizures are presumptively unreasonable, but there are several exceptions to the warrant requirement.  *King*, 563 U.S. at 459.  One such exception permits law enforcement to search a home based on consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

### III.    LAW & ANALYSIS

Triplett's Motion to Suppress challenges all evidence resulting from the police search of the front room of Mitchell's house, including the gun itself, along with any DNA or forensic evidence deriving from the gun.  (ECF No. 46).  He bears the initial burden of proof under the Fourth Amendment to show a violation that justifies suppression.  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).  This burden encompasses both "production and persuasion."  *United States v. Rowe*, 2026 WL 507414, at *3 (S.D. Ohio Feb. 24, 2026) (Marbley, J.) (quoting *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014)).  Should Triplett satisfy this initial burden, the Government must then "demonstrat[e] an exception to the warrant requirement."  *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019).

### A.  Standing

As a threshold matter, Triplett must show that he has standing to challenge the police search of the home.  The Government argues that Triplett lacks standing to challenge the search of Mitchell's home because he was an unwelcome guest.  (ECF No. 49 at 4–5).  Triplett counters that he has standing because the police themselves "described the [front] room [of the home] as the room

Mr. Triplett said he shared with Haley [Mitchell]." (ECF No. 46 at 7).  Triplett contends that if the front room was "sufficiently" his "to make the firearm relevant against him," then he must have a sufficient privacy interest in that room to challenge the lawfulness of the police search of that room. (*Id.*).

Any person seeking to challenge a search "must have a cognizable Fourth Amendment interest in the place searched before seeking relief." *Byrd v. United States*, 584 U.S. 395, 410 (2018). This is referred to as Fourth Amendment standing, though it is not jurisdictional.  Instead, it is "subsumed under substantive Fourth Amendment doctrine." *Id.* at 410–11.  Fourth Amendment standing exists where a prospective challenger has a reasonable expectation of privacy.  *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009).  For Triplett to establish a reasonable expectation of privacy to challenge the search of Mitchell's residence, he must show:  (1) "he had a subjective expectation of privacy"; and (2) "his expectation was objectively reasonable." *Id.*  To determine whether a defendant had a subjective expectation of privacy, the Court asks whether the individual "has shown that he sought to preserve something as private." *Bond v. United States*, 729 U.S. 334, 338 (2000) (cleaned up).  An expectation of privacy is objectively reasonable only if society is prepared to recognize that expectation as legitimate. *Washington*, 573 F.3d at 283.

A guest who stays at a home overnight has a "legitimate expectation of privacy in his host's home." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990).  Thus, the overnight houseguest has standing to challenge a search under the Fourth Amendment. *Id.* at 96–97, 100; *accord United States v. Allen*, 720 F. App'x 254, 257–58 (6th Cir. 2018).  But this assumes that the guest is invited by the host, who owns or rents the home.  If a guest arrives at a home not at the host's invitation, but at the invitation of the host's guest, such a guest-of-a-guest generally has no reasonable expectation of privacy because that guest "[cannot] be assured that his host would respect his privacy." *United*

*States v. Berryhill*, 352 F.3d 315, 318 (6th Cir. 2003). As the Supreme Court observed in *Olson*, "few houseguests will invite others to visit them while they are guests without consulting their hosts," and the hosts "have the authority to exclude despite the wishes of the guest." *Olson*, 495 U.S. at 99. Still, the guest-of-a-guest may have a reasonable expectation of privacy in a host's residence "where the guest [is] able to show a meaningful connection" to that residence. *United States v. Haynes*, 108 F. App'x 372, 375 (6th Cir. 2004). Absent that meaningful connection,[1] however, and without "any indications of acceptance into the household," the guest of a guest does not have a reasonable expectation of privacy in the residence. *Id.*

Here, Triplett has not shown a meaningful connection to the residence or acceptance into its household. Although he claims to reside at the home along with Haley Mitchell, Jessica Miller, and "Man," all the evidence beside his assertion points to the contrary. When the police first arrived, Triplett referred to Miller as sleeping on a *couch* in the front room—he did not characterize Miller as sleeping on a bed or in his bedroom. By Triplett's own admission, it appeared that only Mitchell had keys to the home. Additionally, Triplett could not recall the landlord's name, despite informing police that they had just moved in.

By contrast, Mitchell appeared to know the landlord's name—the name she gave police matched the name given by residents of the neighboring home on the same plot of land. Though the front room in question was occupied by Miller when the police arrived, and had indicia that Miller and Triplett may have been staying there, its setup appeared to be that of a living room that could convert into a guest bedroom when need be—the front door opened into the room, any room

---

[1] In *Haynes*, the defendant argued that he had a reasonable expectation of privacy in the yard of his friend's house because he was a social guest. The Sixth Circuit affirmed the district court's denial of the defendant's motion to suppress, observing that the defendant knew the homeowner only by a nickname, and was present because he was socializing with the homeowner's cousin. *Haynes*, 108 F. App'x at 373 n.1.

occupants apparently slept on an air mattress on top of a futon, the room had a television and folding chairs along the wall, and it appeared that not all of the items in the room belonged to Miller and Triplett; rather, Miller and Triplett's belongings were confined to individual bags and items of clothing. Finally, Mitchell asserted that she, and only she, resided in the house. Mitchell's claim is substantiated by Miller's statement[2] to police. On the other hand, Triplett's claim to police that both he and Miller shared the home with Mitchell is flatly contradicted by Miller's own statement that she was homeless, and that Mitchell was the home's only resident.

There is no doubt that Mitchell resided at the home—but Triplett has not established evidence showing that he resided there with Mitchell. Taken together, the constellation of evidence makes it "wholly insufficient" for Triplett to assert "a legitimate expectation of privacy" in the front room of the home. *Haynes*, 108 F. App'x at 375. As a result, he cannot move to suppress the gun discovered between the air mattress and the futon.[3]

Even if Triplett did have a meaningful connection to the residence, and had been accepted by the household, Mitchell's subsequent withdrawal of his welcome could end any reasonable expectation of privacy he might have possessed. When a guest refuses his host's order to leave, his presence becomes wrongful. Nearly fifty years ago, the Supreme Court instructed that a person who is "wrongfully on the premises could not move to suppress evidence obtained as a result of searching

---

[2] Interestingly, neither party engaged with Miller's statement to police, despite it being captured on Officer Feldman's body-worn camera and submitted to the Court and admitted into evidence as Defense Exhibit 1. There are no hearsay concerns in the Court relying on it, because "a court may rely on hearsay evidence, otherwise inadmissible at trial, in ruling on a motion to suppress." *United States v. Kellogg*, 202 F. App'x 96, 102 (6th Cir. 2006); *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.").

[3] This is not to say that Triplett would lack a legitimate expectation of privacy in all respects. The Court need not consider, and does not reach whether Triplett could assert a privacy interest in the contents of the duffel bag found in the front room, if he claims that the duffel bag was his.

8

them." *Rakas v. Illinois*, 439 U.S. 128, 141 (1978).  Thus, while the "burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy," that expectation "is not one which the law recognizes as 'legitimate.'" *Id.* at 143 n.12.  In 2018, the Supreme Court reaffirmed this reasoning.  *Byrd*, 584 U.S. at 409.  Here, there is ample record evidence suggesting that Triplett's presence was contrary to Mitchell's wishes, and thus wrongful.  Indeed, the balance of that evidence suggests that Triplett had no residential rights to the home at all, and his representations to police are not only vague, dubious, and occasionally contradictory, but they are also countered by the uniform and coherent stories that Mitchell and Miller each presented to different police officers at different times and at locations.

Trespassers who seek to challenge the search of the property upon which they trespass advance "frivolous" arguments.  *United States v. Schram*, 901 F.3d 1042, 1044, 1046 (9th Cir. 2018); *accord United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005) (collecting cases and concluding that "those who inhabit a residence wrongfully may not claim a legitimate expectation of privacy in the property").  The record indicates that Mitchell "had not acquiesced" to Triplett's presence at her residence.  *United States v. Hunyady*, 409 F.3d 297, 302 (6th Cir. 2005).  Rather, she apparently attempted to have Triplett leave her home and ultimately left herself so that she could seek help from the police in getting Triplett out.  Triplett's presence became wrongful at the time when he was ordered to leave the residence and failed to do so—well before the police conducted their search.  By failing to adhere to Mitchell's order to leave, Triplett became a trespasser, unable to assert a reasonable expectation of privacy on Mitchell's property.  *See id.* (applying Michigan law); *Meranda Nixon Estate Wine, LLC v. Cherry Fork Farm Supply Co.*, 2024-Ohio-1523, ¶ 95 (Ohio 12th Dist. Ct. App. 2024) (under Ohio law, trespass requires (1) an unauthorized intentional

act; and (2) an intrusion that interferes with a property owner's right of exclusive possession of the property).

In sum, Triplett lacks standing to suppress evidence of the gun because he lacks standing to assert a privacy interest to a residence where his presence was wrongful. Triplett's argument that he must have a privacy interest in the front room before the gun is "sufficiently" his to be relevant against him, (*see* ECF No. 46 at 7), conveniently ignores any scenario where Triplett had worn out his welcome and trespassed. Triplett's logic, followed to its end, would eviscerate the rule that the law does not sustain certain subjective expectations of privacy if the individual asserting them cannot have a legitimate expectation of privacy based on his own wrongdoing. *See Rakas*, 439 U.S. at 141.

### B. Resident's Consent

Even assuming Triplett did have standing to challenge the police search of the home, the weight of the record evidence still would demonstrate that Mitchell was the sole resident, and Triplett's challenge would be that of a guest. Mitchell consented to the search of her home, and her consent is valid. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (police searches do not violate the Fourth Amendment where "voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises"); *see United States v. Russell*, 361 F. Supp. 3d 753, 761 (S.D. Ohio 2019) (Barrett, J.) (finding that "the bodycam video is evidence" of voluntary consent to a search).

The firearm was found in the front room of Mitchell's home in between a futon and an air mattress that *Miller*—not Triplett—was sleeping on when police arrived. Triplett himself referred to Miller as sleeping on a couch, and Miller later confirmed that she was homeless and that the house was not her (or Triplett's) home. This evidence suggests that Miller was sleeping in the living room,

10

where the couch had been converted for her use.[4]  It may also be the case that Triplett slept on the converted couch with Miller, but the evidence cannot support a claim to a protectable expectation of privacy in the front room—which had the front entrance to the home.  No evidence adduced at the suppression hearing showed why Triplett would have "clearly manifested an expectation of privacy" in what was underneath the air mattress.  *United States v. Cork*, 18 F. App'x 376, 383 (2001) (finding homeowner had common authority over minor's room).  Even assuming that Triplett sought to preserve the firearm as private by stashing it between the air mattress and the futon, society would not recognize his expectation of privacy as legitimate.  At best, he was a houseguest sharing an air mattress on a futon in what was both a living room and entrance to the home.  The fact that the front room had a television set up facing the futon, with chairs folded along the walls, further suggests that this room served as a living room by day, when guests' air mattresses might be stowed and anything underneath them would resurface.  Under these circumstances, Triplett's assertion of a privacy interest in what is placed underneath his temporary bedding is not an expectation of privacy that society is prepared to recognize as legitimate.

Mitchell could validly consent to a search of her home.  True, as a houseguest, Triplett could have an expectation of privacy over his own personal containers, like a suitcase, lockbox, or duffel bag, that Mitchell's consent as a homeowner would not reach.  *See, e.g.*, *Cork*, 18 F. App'x at 383 ("[A]uthority to consent to the search of the bedroom does not necessarily extend to the search of containers in the bedroom."); *United States v. Waller*, 426 F.3d 838, 847–48 (6th Cir. 2005) ("[L]uggage is the type of container that historically commands a high degree of privacy.") (cleaned up).  But because the gun was located between the futon and an air mattress in an apparent common

---

[4] The Court credits Sergeant Harshbarger's testimony that the front room of the home seemed more like a living room to him, which aligns with the Court's own interpretation based on viewing the body-cam footage.

space over which Mitchell had dominion, Triplett did not have a protectable expectation of privacy in its location.  Mitchell's consent to the search was valid, and Triplett's challenge to the search would still fail on its merits.

## IV.    CONCLUSION

For the foregoing reasons, Triplett's Motion (ECF No. 46) is **DENIED**.  The Government may introduce evidence resulting from the police search of Mitchell's home, including the firearm, along with any DNA or forensic evidence deriving from that firearm.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: June 30, 2026**

12